```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/20/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                                       :
JAMES WILSON,                                          :
                                                       :
                              Plaintiff,               :        13 Civ. 6937 (KBF)
            -v-                                         :
                                                       :        OPINION & ORDER
MARK L. BRADT,                                         :
                                                       :
                              Defendant.               :
---------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        On September 27, 2013, petitioner James Wilson ("petitioner" or "Wilson")

filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

(ECF No. 2.)  Petitioner seeks relief from the April 17, 2009 judgment of the

Supreme Court of the State of New York, New York County, whereby he was

convicted of Murder in the First Degree (N.Y. Penal Law § 125.27(1)(a)(vii)) and

sentenced to life in prison without the possibility of parole.  Petitioner is currently

incarcerated pursuant to that conviction.

        On March 13, 2012, the First Department unanimously affirmed petitioner's

conviction.  See People v. Wilson, 93 N.Y.S.2d 483 (1st Dep't 2012).  On July 11,

2012, the New York Court of Appeals denied petitioner's leave to appeal.  (Resp't's

Mem. of Law in Opp'n to the Pet. for a Writ of Habeas Corpus ("Resp't Mem."), Ex.

V, Mar. 6, 2014, ECF No. 11.)

Petitioner challenges his conviction on six grounds: (1) the trial court denied petitioner a fair trial by modifying its <u>Sandoval</u>[1] ruling while petitioner was testifying; (2) the trial court denied petitioner the right to a fair trial as a result of its "interested witness" charge; (3) the trial court failed to suppress evidence obtained in violation of petitioner's right to counsel; (4) petitioner was denied a speedy trial, in violation of the Sixth Amendment; (5) petitioner was denied his right to a jury free from bias and external influence, in violation of the Sixth Amendment; and (6) petitioner's sentence is unduly harsh and excessive.[2] (Pet. for Writ of Habeas Corpus ("Pet."), Sept. 27, 2013, ECF No. 2.)

For the reasons set forth below, Wilson's request for habeas relief is DENIED.

## I.   FACTUAL BACKGROUND

### A.   <u>The Murder</u>

On April 28, 2004, petitioner and another individual, Cornelius Drake spent the night in the apartment of petitioner's neighbor, William Willis. (Resp't Mem. 1.)

At approximately 8:30 a.m. the next morning, April 29, 2004, petitioner departed from Willis's apartment. (<u>Id.</u>, Ex. P at 15; <u>see also</u> Trial Tr. ("Tr.") 412-13.) Later that morning, sometime between 10:00 a.m. and 11:00 a.m., petitioner returned to Willis's apartment. (<u>See</u> Resp't Mem. 1, Ex. P at 16-17.) While there,

---

[1] <u>See</u> <u>People v. Sandoval</u>, 34 N.Y.2d 371 (1974).

[2] Although petitioner has indicated that he wishes to withdraw his biased jury and excessive punishment claims (Pet.'s Reply Mem. of Law in Support of a Pet. for Habeas Corpus ("Reply") 30, June 9, 2014, ECF No. 17), the Court construes petitioner's claims liberally and addresses these claims in full. <u>See</u> <u>Haines v. Kemer</u>, 404 U.S. 520-21 (1972) (per curiam); <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996).

petitioner "beat Willis with a baseball bat and an axe handle and slashed Willis's throat [with a knife], severing his jugular vein." (Resp't Mem. 1.) After slashing Willis's throat, petitioner took Willis's ring and wallet. (Id. at 1-2.) Around 11:00 a.m., petitioner pawned Willis's ring for $25.00 at Golden Pawn Shop II, located at 2482 Seventh Avenue in Harlem, New York. (Id., Ex. P at 17.)

At approximately 1:00 p.m., petitioner saw another of his neighbors (and a distant relative of Willis), Shotetice Price inside petitioner and Willis's building. (Id., Ex. P at 16, 18.) Price testified that she observed that petitioner did not "look like himself" and asked petitioner what was bothering him. (Id., Ex. P at 18.) Petitioner responded, "You just don't know. It won't be long now." (Id.)

Sometime after 12:00 p.m., Drake went to Willis's apartment to look for Willis, who had said he would meet Drake at the Social Security office. (Id., Ex. P at 18.) Drake found Willis laying a pool of blood. (Id.; see also tr. 416.) Drake went downstairs and told an unidentified individual to call the police. (Resp't Mem., Ex. P at 18; see also tr. 418-19.)

B. The Police Investigation

Willis was pronounced dead upon the arrival of police officers and emergency medical technicians at the scene of the crime. (Resp't Mem., Ex. P at 19; see also tr. 40.)

Price testified that, shortly thereafter, she learned of Willis's death and relayed that information to petitioner. (Tr. 460-61.) Petitioner said nothing in response. (Tr. 461.) Petitioner went to Willis's apartment and told police officers

3

that he needed to retrieve a blue duffel bag he had left at Willis's apartment.[3]  (See Resp't Mem. 16, Ex. C at 2.)  Petitioner was told that he could not enter the apartment because a police investigation was underway and that he should talk to a detective.  (Id. 2-3, Ex. P at 20.)  Petitioner agreed to be escorted to the precinct by Detective Norman Calderon.  (Id., Ex. C at 3.)

Petitioner was cooperative during the trip to the precinct and the interview; he was not handcuffed, frisked, searched, or restrained during the trip.  (Id.)  As Calderon walked petitioner into the precinct, he noticed what appeared to be blood stains on petitioner's shirt.  (Id.)  When petitioner arrived at the precinct, the police asked him to wait in a lieutenant's office.  (Id., Ex. C. at 3-4.)  Petitioner did not request to leave the precinct.  (Id., Ex. C. at 6.)

At the precinct, Detectives Edward Clifford, Gerard Blake, Thaddeus Hall, and Calderon interviewed petitioner in a lieutenant's office.  (Id., Ex. C at 3-4, 6-7.)

Clifford testified that, during the interview, petitioner admitted he regularly used crack cocaine and that he had done so on April 29, 2004.  (Suppression Hr'g. Tr. ("S.Tr.") 184-85.)  Petitioner initially stated he knew nothing about Willis's death.  (Resp't Mem., Ex. C at 7.)  This statement was reduced to writing and signed by petitioner.  (Id., Ex. C at 9-10.)  Detective Clifford then asked petitioner if he "had any problems" with Detective Clifford reading petitioner his Miranda[4] rights.  (Id., Ex. C at 8.)  Petitioner asked if he was under arrest and Detective

---

[3] Approximately 40 minutes before petitioner arrived, another man came to the apartment and repeatedly asked for the same blue duffel bag, to no avail.  (Resp't Mem., Ex. C at 2.)  The record does not indicate the man's identity.  (Id.)
[4] See Miranda v. Arizona, 384 U.S. 436 (1966).

Clifford told him he was not.  (Id.)  Petitioner then laughed and said, "Go ahead, read me my rights.  I know those rights better than you do."  (Id. at 9.)  Thereafter, Clifford confronted petitioner about the blood stains on his clothing.  (Id. at 11.)

The questioning ceased for about 20 minutes while petitioner ate dinner. (Id.)  After dinner, petitioner called Clifford back into the office; petitioner told Clifford that he happened upon Willis's body alone, before the police arrived, and found Willis dead.  (Id., Ex. C at 13.)  Petitioner told the detectives that he "robbed a dead man" and that he stole and pawned Willis's ring.  (See id.)  Petitioner gave the detectives three pawn tickets, including the ticket for Willis's ring.  (Id.) Petitioner's statement was reduced to writing and signed by petitioner.  (Id., Ex. C at 13-14.)  Clifford placed petitioner under arrest for larceny.  (Id., Ex. C at 14.)

After arresting petitioner, police officers searched petitioner's clothing and found a folding knife.  (Id.)  The police removed petitioner's clothing and provided the items to the Medical Examiner's Office to analyze what appeared to be blood stains on the clothing.[5]  (Id., Ex. C at 14-15.)

Although petitioner was arrested for larceny, an indictment was not filed against him within five days of arrest, as required by § 180.80 of the New York Criminal Procedure Law.  (Id., Ex. C at 15.)  Accordingly, petitioner was released on his own recognizance.  (See id.)

---

[5] The Medical Examiner's Office ultimately determined that the stains on the front, back, hood, and sleeves of petitioner's sweatshirt contained a mixture of Willis's and petitioner's blood.  (See Resp't Mem. 47, Ex. H at 3, Ex. P at 28.)

On July 4, 2005, petitioner was arrested for possessing a forged instrument and for selling Metrocard swipes.  (Id., Ex. C at 15.)  During the ride to the station house, petitioner told the arresting officers that he had killed someone before and that prison time associated with the Metrocard charge would be negligible in comparison.[6]  (Id., Ex. C at 16.)

On January 27, 2006, petitioner was indicted on charges of Murder in the First Degree (N.Y. Penal Law § 125.27(1)(a)(vii), (b)) and Murder in the Second Degree (N.Y. Penal Law § 125.25(1)), under Indictment Number 6826/05.  (Id. at 47, Ex. A.)

II.   PROCEDURAL HISTORY

  A. Pre-Trial Motions

By pro se motion dated May 25, 2006, petitioner moved to dismiss the Indictment, arguing he had been denied a speedy trial.  (Id., Ex E.)  By filing dated October 30, 2008, petitioner submitted a second pro se motion to dismiss, arguing that his right to a speedy trial had been violated.  (Id., Ex. F.)  On November 3, 2008, the State filed papers in opposition.  (Id., Ex. G.)  On November 10, 2008, the trial court rejected petitioner's contention that his right to a speedy trial had been violated.  (Id., Ex. H.)

Separately, petitioner made a motion to suppress the statements and any evidence taken at the precinct.  Judge Richard Carruthers presided over a hearing

---

[6] As the arresting officers were transporting petitioner to the their command station for processing, "Wilson said that he had killed somebody before, and that the time he would spend on the new charges 'ain't nothing.'"  (Resp't Mem., Ex. C. at 16.)  One of the officers testified "that Wilson seemed to be bragging at the time."  (Id.)

on the motion and, on February 27, 2008, issued a written opinion denying petitioner's motion "in all respects." (Id., Ex. C at 36.)

On November 3, 2008, Judge Zweibel presided over a <u>Sandoval</u> hearing, which is intended "to provide the defendant with an advance ruling on whether the People will be permitted to cross-examine him or her about particular criminal (charged or uncharged), vicious, or immoral conduct for the purpose of impeaching credibility should he or she testify at trial." <u>People v. Morales</u>, 764 N.Y.S.2d 104, 106 (2d Dep't 2003). (Resp't Mem., Ex. D.) At the hearing, the State sought permission to introduce as evidence a number of petitioner's prior convictions and the underlying facts that led to each conviction. (Resp't Mem., Ex. D at 9-17.) The court ruled that if petitioner testified, the State could ask him about four prior convictions: a 2006 attempted forgery, a 2000 petit larceny, a 1998 grand larceny, and a 1987 attempted robbery. (Id., Ex. D. at 4.) The court determined that the State could ask about the underlying facts of only the 1987 attempted robbery, where petitioner "held a metal like object to the complainant's throat, said it was a knife, and demanded money." (Id., Ex. D at 16, 23, 30-31.)

B. <u>Trial</u>[7]

On November 10, 2008, petitioner's trial by jury commenced before Judge Zweibel. (Tr. 1; <u>see also</u> Resp't Mem. 3.) After respondent rested its case-in-chief, petitioner asked the court to amend its <u>Sandoval</u> ruling given the similarity between the 1987 attempted robbery conviction and the crime for which petitioner

---

[7] The Court addresses only those aspects of the trial that are relevant to the pending habeas petition.

was on trial.  (Tr. 961-63.)  The court granted the request, verbally amending its
Sandoval ruling and holding that respondent may still introduce the fact that
petitioner was convicted of attempted robbery in 1987, but that the underlying facts
of that conviction could not be raised.  (Tr. 967.)

Petitioner took the stand and testified in his own defense.  Petitioner denied
that he had killed Willis, testifying that he had merely stolen Willis's ring and
wallet from Willis's dead body.  (Tr. 996-1000.)[8]  The State asked petitioner if he
had been convicted of attempted forgery in 2006; petitioner answered in the
affirmative and the State then asked if he was, in fact, guilty of attempted forgery.
(Tr. 1034-35.)  Petitioner's counsel objected, arguing that asking petitioner whether
or not he was actually guilty was tantamount to asking about the underlying facts
of the attempted forgery conviction, which Judge Zweibel had disallowed.  (Tr. 1035-
39.)  Judge Zweibel stated:  "If [petitioner] denies his guilt to the charge, then I
think it would open the door" to allow respondent to introduce the underlying facts.
(Tr. 1036.)

The State then asked petitioner if he had been convicted of an attempted
robbery in 1987 and if he was in fact guilty of that crime.  (Tr. 1042-43.)  Petitioner
denied his guilt and his counsel objected.  (Tr. 1042-45.)  The court overruled the
objection, determined that petitioner had opened the door to the introduction of the
underlying facts of the 1987 conviction because he had denied guilt, and allowed the

---

[8] On cross-examination, the State asked: "[Y]ou wouldn't lie to this jury to try to beat a murder case;
[sic] would you?"  (Tr. 1108.)  Petitioner responded, "I'm not gonna [sic] tell you that I wouldn't lie to
this jury to beat a murder case.  I will tell you that I haven't lied to this jury to beat a murder case."
(Id.)

State to introduce the underlying facts.  (Tr. 1045.)  The State's questioning of

petitioner on this point consisted of the following:

> Q:    Mr. Wilson, isn't it true that in that case, you and
> your cohort approached the complainant, and as the
> complainant passed, both you and your cohort grabbed
> the complainant, threw him against the wall, and you
> held a metallic object to his throat, and you said it was a
> knife, and you demand[ed] money.  And when the police
> came, you threw the knife over the wall where it was later
> recovered.  Is that true?
>
> . . .
>
> A:    No, sir.  It isn't true.
>
> . . .
>
> Q:    You were convicted of doing exactly that?
>
> A:    Yes, sir.  I was convicted.
>
> Q:    In that case, did you testify that you weren't even
> there?
>
> . . .
>
> A:    Yes, sir.

(Tr. 1046-47.)

   C.  <u>Jury Charge</u>

       In a final discussion regarding the jury charge, petitioner requested that

Judge Zweibel not "separate out the defendant by saying he's an interested witness

as a matter of law," arguing that doing so would violate petitioner's due process

rights and citing <u>United States v. Brutus</u>, 505 F.3d 80 (2d Cir. 2007).  (<u>See</u> tr. 1138-

39.)  Judge Zweibel denied petitioner's request.

During his charge to the jury, Judge Zweibel instructed the jury to consider whether each witness is "interested" or "disinterested." (Tr. 1315-16.) Judge Zweibel instructed the jury:

> Another factor you may consider in accessing [sic] the credibility of a witness, is whether a witness is an interested witness or a disinterested witness. The witness is an interested witness, when, by reason of relationship, friendship, antagonism, or prejudice, in favor of or against one party or the other, the witness's testimony is, in your judgment, likely to be biased toward the side the witness favors. The defendant, who took the stand and testified in his own behalf, is an interested witness. It is for you to decide whether any of the other witnesses in this case should be considered interested. Now, there is no presumption that an interested witness lies or that a disinterested witness tells the truth. It is for you to decide to what extent, if any, a witness's interest in the outcome of this case affected his or her credibility.

(Tr. 1315-16.)

### D. Conviction and Sentence

On December 2, 2008, the jury convicted petitioner of Murder in the First Degree. (Tr. 1350, 1358.) On April 17, 2009, the court sentenced petitioner to life in prison without the possibility of parole. (Resp't Mem., Ex. N at 1, 15.)[9]

---

[9] The Court justified its sentence based on "the particularly brutal nature of the crime, [of] which I find that there was overwhelming evidence." (Resp't Mem., Ex. N. at 15.) "[T]his jury decided this case very quickly, within an hour. One of the fastest verdicts I have ever seen frankly in a murder case. There was no question in the jury's mind. There was not much for them to deliberate at all, figuring out the facts in this case." (Id.)

E.  <u>Post-Trial Motions and Appeals</u>

      1.  <u>Motion to set aside the verdict based on juror misconduct</u>

On December 29, 2008, petitioner made a motion to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30(2), arguing that Juror Number Three, Julia Filz, posted comments on Facebook showing that she had violated the trial court's admonitions and that she was unfairly biased.  (Resp't Mem., Ex. I.) Specifically, Filz "had made a number of [Facebook] entries about the case, including one on November 5, 2008, after she had been selected as a juror, and one on November 19, 2008, during the middle of the trial."  (<u>Id.</u> at 4.)

In particular, on November 5, 2008, Filz posted on her Facebook page:  "Julia got picked for a criminal trial."  (Resp't Mem., Ex. J at 20.[10])  Various people posted the following comments in response to Filz's post:

- Hang 'em!

- Tell em you got a thing against criminals.  Like, that should ruin your unbiased perspective

- Watch out criminals . . . you got a southerner on the jury!

- That's awesome!  I'm sure it's nothing like the Law and Order show[] but it should be pretty interesting!  [H]ave fun ;)

- Be an alpha dog and make sure whatever you think is the winning side is the winning side.  It is incredibly easy to flip opinions of other jurors since you will be smarter than the other 11 as you wanted jury duty or you would have found a way out of it.  Whatever you do don't let someone guilty walk because of the CSI effect.

---

[10] The Court has numbered the pages in Exhibit J for ease of reference.

(Id.)

On November 7, 2008, Filz posted:  "Julia found some amazingly cute dresses and on sale!  I will be one well-dressed juror next week."  (Id. at 19.)

On November 10, 2008, Judge Zweibel instructed the jury:  "I instruct you that during the course of the trial, you are not to discuss the case or anything about it with each other or anyone else.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you, simply, must not talk about this case with anyone."  (Tr. 6.)  That same day, Filz posted on her Facebook profile:  "Julia is hanging with a different kind of Justice League."  (Resp't Mem., Ex. J at 19.)

On November 14, 2008, Filz posted:  "Julia found out that one of her fellow jurors' brothers was the 'watermelon guy' in Dirty Dancing.  See what we talk about when we're NOT discussing the case? :)."  (Id. at 18.)

On December 2, 2008 at 12:18 p.m., Filz posted:  "Julia completed jury duty and found a man guilty of first degree murder."  (Id. at 17.)  In response, people wrote, inter alia:

- Julia!  You hater!  You had it in for him since Day One. . .

- Reverse 'Twelve Angry Men,' you had to persuade the other eleven that the SOB was guilty.

(Id.)  One commenter asked, "Do you get to sit in on sentencing or is that reserved for the judge in your area?"  (Id.)  In response, Filz wrote:  "Nope no sentencing requirements.  The judge will schedule that with the attorneys in the next few weeks."  (Id.)  After receiving a few more comments, on December 2, 2008 at 3:24 p.m., Filz commented:

> We were selected for the trial on November 5 and though we did have a full week off last week, it was still a long haul.  The defendant was accused of beating the victim over the head with an axe handle and baseball bat, then slitting his throat ear to ear.  All for $25 so he could buy some crack.  It came down to timing . . . just 41 minutes from the time the victim hung up the phone with his nephew and the defendant was seen using the vic's [sic] ATM card (later found with blood) at the bodega across the street.  His excuse was "I found him dead and decided to rob the body."  Um . . . yeah . . .

(Id. at 18.)

On March 30, 2009, Judge Zweibel presided over a hearing to address petitioner's motion regarding Filz's Facebook posts.  (Id., Ex. L.)  Filz testified and faced cross-examination, and the court entertained oral argument.  (Id.)  At the conclusion of the hearing, Judge Zweibel denied petitioner's motion.  (Id. at 22.) Judge Zweibel determined:

> I find that based on [Filz's] testimony she wasn't influenced by any of the remarks by people who wrote back to her in response to her stating she is serving on a murder trial.  I found her to be credible.  Anything that was discussed on [Facebook] or rather the comments that were made to her were not discussed among other jurors.

(Id.)[11]

### 2. Appeal to the First Department

Petitioner appealed his conviction on the following six grounds:[12]

- The trial court denied Wilson a fair trial when it reversed its <u>Sandoval</u> ruling in the middle of Wilson's testimony and

---

[11] Judge Zweibel also noted: "In the future my instructions are going to be [that jurors] are not to go on [Facebook] or the Internet.  I did give an instruction [that] they are not to discuss the case with anybody." (Resp't Mem., Ex. L at 22.)

[12] Petitioner was represented on appeal by Steven Banks and Dechert LLP. (Resp't Mem., Ex. O at 1.)

permitted questioning about facts underlying one of his past crimes;

- The defendant's constitutional right to presumption of innocence was impaired by the interested witness jury instruction;

- Because the defendant repeatedly invoked his right to counsel, the evidence obtained following his invocation should have been suppressed as fruit of the poisonous tree;

- Wilson's right to a speedy trial was violated;

- Wilson's conviction should be set aside because he did not have the benefit of a fair and impartial jury, free of bias and external influence; [and]

- Wilson's sentence was unduly harsh and should be modified to life with the possibility of parole.

(Id., Ex. O.)

On March 13, 2012, the First Department affirmed petitioner's conviction and sentence. (Id., Ex. R.) The First Department largely upheld the trial court's determinations, but agreed with petitioner "that his trial testimony did not open the door to an inquiry that had been precluded under the court's Sandoval rule." (Id.) "However," the First Department concluded, "any error in the court's modification of its Sandoval ruling was harmless." (Id.) (citation omitted). The First Department reasoned: "There was overwhelming evidence of defendant's guilt, and there is no reasonable possibility that the jury would have accepted his incredible testimony, in which he attempted to explain his possession of the victim's property. Furthermore, the offending evidence was cumulative to other impeachment material." (Id.) (citation omitted).

3.  Leave to Appeal

By letter dated April 10, 2012, petitioner sought leave to appeal to the New York Court of Appeals.[13]  (Resp't Mem., Ex. S.)  On May 7, 2012, petitioner filed an additional letter in support of his request, arguing in particular that:

> [Petitioner's a]ppeal presents important questions about a criminal defendant's right to make an informed choice about whether he should take the stand to testify in his own defense, and the prejudicial impact of a criminal defendant's prior convictions – which were erroneously admitted over his objections and in contravention of the trial court's Sandoval ruling – on the defendant's right to a fair trial.

(Id., Ex. S at 1.)  Petitioner contended that this was not the first time the First Department erroneously affirmed a conviction where certain evidence was admitted in violation of Sandoval.  (Id., Ex. S at 10.)  (Petitioner also reiterated his other grounds for relief.)  (Id., Ex. S at 11.)  On May 21, 2012, the State submitted a letter in opposition.  (See id., Ex. U.)

On July 11, 2012, the Court of Appeals summarily denied petitioner's request to appeal.  (Id., Ex. V.)

4.  Habeas Petition

On September 27, 2013, petitioner filed the now-pending habeas petition.  (ECF No. 2.)  The State filed its opposition on March 6, 2014 (ECF No. 11), and on June 9, 2014, petitioner filed his reply.  (ECF No. 17.)

---

[13] Petitioner was represented by counsel from Dechert LLP on this motion.  (Resp't Mem., Ex. S.)

III.   LEGAL FRAMEWORK

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires that in order for a petitioner to prevail on a petition for habeas corpus, he must demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(l)-(2).  A petitioner shows that a state court's decision is contrary to clearly applicable federal law "by demonstrating either (1) that the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court, or (2) that, when presented with facts that are materially indistinguishable from a relevant Supreme Court precedent, the state court arrived at a result opposite to the one reached by the Supreme Court." Evans v. Fischer, 712 F.3d 125, 132-33 (2d Cir. 2013) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)) (internal quotation marks omitted).  A petitioner demonstrates that a state court decision was based on an unreasonable application of federal law by proving that the state court "unreasonably applied" federal legal principles "to the facts of the case before it . . . involv[ing] some increment of incorrectness beyond error." Id. at 133 (internal quotation marks and citation omitted).

Those seeking habeas relief face a high burden and a reviewing court must give a state court decision due deference.  See Harrington v. Richter, – U.S. – , 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was

16

meant to be."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (noting that § 2254's "highly deferential" standard "demands that state-court decisions be given the benefit of the doubt").  Indeed, state court decisions are presumed to be correct, and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Habeas will not be granted "merely because there is a reasonable possibility that trial error contributed to the verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

## IV.  THRESHOLD ISSUES

### A. <u>Unduly Harsh Sentence</u>

Petitioner argues that the imposition of a life sentence without the possibility of parole is "unduly harsh and excessive."  (Pet. 13.)  This claim is based solely state law and thus cannot provide a basis for federal habeas relief.  <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); <u>see also</u> <u>Parson v. Superintendent of Fishkill Corr. Facility</u>, No. 12 Civ. 2358, 2013 WL 1953181, at *2 (S.D.N.Y. May 13, 2013).  Thus, the Court denies petitioner's request that habeas relief be granted due to his allegedly "unduly harsh and excessive sentence."

### B. <u>Timeliness</u>

Pursuant to AEDPA, state prisoners seeking habeas review must adhere to a one-year statute of limitation.  28 U.S.C. § 2244(d)(1)(A); <u>see, e.g.,</u> <u>Atkins v. Gonyea</u>, No. 12 Civ. 9186, 2014 WL 199513, at *1 (S .D.N.Y. Jan. 17, 2014); <u>Simmons v.</u>

Brown, No. 08 Civ. 1425, 2011 WL 2133844, at *5 (E.D.N.Y. May 26, 2011); Ruiz v. Poole, 566 F. Supp. 2d 336, 340 (S.D.N.Y. 2008).

Generally, the statute begins to run on "the date on which the [petitioner's] judgment [of conviction] became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). "[A] conviction becomes final 90 days after the highest court affirms the conviction, assuming no petition for a writ of certiorari is filed." Smith v. Lee, No. 11 Civ. 8376, 2013 WL 2467988, at *7 (S.D.N.Y. June 7, 2013) (citing 28 U.S.C. § 2244(d); S.Ct. R. 13(1)). However, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2); Acosta v. Artuz, 221 F.3d 117, 119 (2d Cir. 2000).

In this case, the judgment against petitioner was entered on April 17, 2009. Petitioner appealed and on March 3, 2012, the First Department affirmed petitioner's conviction. Petitioner sought leave to appeal, which was denied on July 11, 2012. Thus, petitioner's conviction become final 90 days later, on October 9, 2012. Petitioner filed the now pending habeas corpus petition on September 27, 2013, less than one year later. Thus, the petition was timely filed in accordance with AEDPA.

C. <u>Exhaustion</u>

Pursuant to AEDPA, a petitioner must have "exhausted the remedies available in the courts of the state" unless there is "an absence of available [s]tate corrective process." 28 U.S.C. § 2254(b)(1)(A), (B)(i). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." <u>Carvaial v. Artus</u>, 633 F.3d 95, 104 (2d Cir. 2011) (internal quotation marks, alteration, and citation omitted) (explaining that the exhaustion requirement "is animated by" principles of comity). "If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred," that claim is not available for habeas review. <u>Id.</u> (citation omitted).

To overcome procedural default, a petitioner must demonstrate "'cause for the default and prejudice' or show[ ] that he is 'actually innocent' of the crime for which he was convicted." <u>Id.</u> (quoting <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001)).

Here, the Court finds that petitioner's claims have been sufficiently exhausted except where otherwise noted.

V.     DISCUSSION

A. <u>Issues Relating to the Sandoval Hearing</u>

1. <u>Exhaustion</u>

The State alleges that petitioner has failed to exhaust his claims regarding the trial court's mid-trial modification of its <u>Sandoval</u> ruling.

Petitioner's claim regarding the trial court's alteration of its <u>Sandoval</u> ruling was addressed in a lengthy letter motion submitted to the Court of Appeals, but the issue was presented essentially as one rooted in state law. The State argues that petitioner's leave application "argued only that the trial court had violated <u>state</u> law," and "while petitioner took issue with the Appellate Division's ruling that the state-law error was harmless, he did not argue that the harmless-error determination violated his federal constitutional rights." (Resp't Mem. 8.)

While the State is correct that the petitioner's argument to the Court of Appeals was rooted in state law, it nonetheless implicated the constitutional right to due process. The argument sufficiently presented the federal constitutional claim so as to give the state court "a fair opportunity to pass upon [the] claim[]." <u>Waterhouse v. Rodriguez</u>, 848 F.2d 375, 380-81 (2d Cir. 1988) (explaining that "[t]he legal theory relied upon in the federal court need not [ ] be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts.") (internal quotation marks and citations omitted). The Court thus finds that petitioner has sufficiently exhausted his claim concerning the trial court's <u>Sandoval</u> ruling modification, such that an examination of the merits of petitioner's claim is warranted.

### 2. <u>Merits</u>

Petitioner argues that the trial court violated his 14th Amendment right to due process "when it reversed its <u>Sandoval</u> ruling in the middle of petitioner's

testimony." (Pet. at 6 (internal quotation marks omitted).)  Liberally construing petitioner's <u>pro se</u> habeas petition, the Court takes petitioner's claim to include both an objection to the trial court's modification of its prior <u>Sandoval</u> ruling, and additionally, an objection to the prejudicial effect of the evidence that was introduced at trial as a result thereof.  <u>See</u> <u>Haines</u>, 404 U.S. at 520-21; <u>Graham</u>, 89 F.3d at 79.

With respect to the trial court's modification of its <u>Sandoval</u> ruling, petitioner explains his argument as follows:  "Though petitioner claims no federal right to an advance ruling, petitioner does contend that once the ruling was made, the modification of said ruling, to expand the scope of cross examination, as petitioner testified, was a violation of petitioner's rights to a fair trial and to due process." (Reply 5.)  Petitioner contends that he "took the stand only after obtaining reconsideration of an unfavorable pretrial ruling" and "the court abused its discretion by expanding the scope of cross examination to allow the very evidence which it had previously ruled was too prejudicial." (<u>Id.</u>)

The trial court's mid-trial modification of its <u>Sandoval</u> ruling does not itself present a federal constitutional issue.  <u>See, e.g.</u>, <u>Warren v. Miller</u>, 78 F. Supp. 2d 120, 134-35 (E.D.N.Y. 2000) (noting that "habeas corpus relief is limited to those situations where there has been a violation of a constitutionally protected right").  While petitioner argues that his decision to testify was based on the court's determination that it would preclude the underlying facts of his attempted robbery conviction, evidentiary rulings are left to the broad discretion of trial court judges,

who must balance the probative value of the evidence against its prejudicial effect. See Davis v. Keane, No. 97 Civ. 8328, 2000 WL 1041454, at *4 (S.D.N.Y. July 28, 2000). The law is clear that a trial court may modify a Sandoval ruling to prevent a defendant from using the earlier Sandoval ruling to mislead the jury. See, e.g., People v. Santiago, 564 N.Y.S.2d 412, 413 (1st Dep't 1991) (reasoning that "petitioner's testimony, during his direct examination . . . was misleading," and as such, petitioner "opened the door for the prosecutor to clarify the exact nature of his prior convictions and his involvement in the crimes").

Moreover, the nature of a criminal trial is such that a trial judge's pretrial determinations may be altered – to the benefit or detriment of defendant – throughout the course of the trial.

Concerning the prejudicial nature of the admitted evidence – which the First Department ultimately determined was improperly admitted – no violation of petitioner's due process rights occurred. First, evidentiary matters are generally reserved for state law; they do not rise to the level of a constitutional violation unless they deprive a defendant of his right to a fair trial or due process. See Dowling v. United States, 493 U.S. 342, 352 (1990) (evidence violates the Due Process Clause if its "introduction . . . is so extremely unfair that its admission violates fundamental conceptions of justice"); Peterson v. Greene, 06 Civ. 41, 06 Civ. 811, 2008 WL 2464273, at *5 (S.D.N.Y. June 18, 2008) (Lynch, D.J.); Davis v. Keane, No. 97 Civ. 8328, 2000 WL 1041454, at *4 (S.D.N.Y. July 28, 2000); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997) ("Generally, rulings by

state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a Constitutional violation.").

The Supreme Court has narrowly defined what constitutes a deprivation of a defendant's right to a fair trial.  See Dowling, 493 U.S. at 352.  Where prejudicial evidence is "probative of [an] essential element" in the case, a defendant's constitutional due process rights are not violated.  Estelle v. McGuire, 502 U.S. 62, 69 (1991).  "For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it;" the court must view "the erroneously admitted evidence in light of the entire record before the jury."  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotation marks and citations omitted); see Sims v. Stinson, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000).  Put another way, "unfairly prejudicial evidence renders a trial fundamentally unfair when there is a reasonable probability that without it the verdict would have been different."  Sims, 101 F. Supp. 2d at 195; see also Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985).

In this case, there is no reasonable probability that had the trial court not admitted the evidence, a different verdict would have resulted.  The evidence showing petitioner's guilt was overwhelming.[14]   Petitioner had the deceased's blood

---

[14] It is not lost on the Court that petitioner's credibility was a significant issue at trial, however.  As petitioner argues:

> At trial there was clear evidence as to the time and manner of the victim's death.  There was also evidence that petitioner was at the scene of the crime within [30] to [40] minutes after the crime.  But petitioner's presence at the crime scene was explained by his testimony that he had come upon the victim's body after the victim

on his clothes; bloody boot prints recovered from the floor of the deceased's apartment matched petitioner's boots; barely 40 minutes after the murder, petitioner attempted to use the deceased's ATM card at a nearby bodega; petitioner pawned the deceased's ring the same day as the murder; and petitioner had identifying medical papers in the deceased's apartment that he attempted to retrieve the same day as the murder.  An acquaintance testified that shortly after the murder and before the deceased's body was discovered, petitioner did not "look like himself."  When she asked him what was wrong, he reportedly said, "You just don't know," and "It won't be long now."  When petitioner was being interviewed by the police the night of the crime, his story was inconsistent – first he denied all involvement and then later confessed that he had robbed Willis's dead body.  At trial, petitioner acknowledged that under certain circumstances, he would be willing to lie under oath.  About a year after the crime, when petitioner was released on bail pending trial, he bragged to transit officers that he had killed a man.  Even setting aside the evidence that was erroneously admitted, the other evidence presented a trial requires a denial of habeas relief – there is no reasonable probability that without the evidence, petitioner would have been acquitted.

---

had been killed and had robbed the body.  (Tr. 996-1000.)  Petitioner's testimony was entirely consistent with all of the physical evidence.  There was no direct evidence of the killer's identity.  There was no eyewitness, and no incriminating fingerprints.  It was up to the jury to determine whether they believed petitioner.

(Reply 6-7.)  Petitioner further notes that as was indicated by juror number three in her Facebook post following the verdict (see infra), credibility was an important issue at trial and the question of petitioner's credibility was resolved against petitioner – according to petitioner, "after petitioner's credibility was severely assailed due to the court's abuse of discretion."  (Id. 9.)

24

It is also notable that there is no clear Supreme Court precedent that requires preclusion of this kind of evidence.  Indeed, "[t]he Supreme Court has expressly reserved the question of whether using evidence of the defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process."  Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) ("Because the [Supreme] Court has expressly left this issue an open question, the state court did not unreasonably apply clearly established federal law in determining the admission of evidence of [petitioner's] criminal history did not violate due process.") (internal quotation marks omitted); see Johnson v. Greiner, 56 F. App'x 38, 39 (2d Cir. 2003) ("Even if evidence of the prior assaults was admitted for the sole purpose of proving Johnson's propensity to engage in similar misconduct again, [petitioner] points to no established Supreme Court precedent on whether, and in what circumstances (if any), evidence of propensity may violate due process."); John v. New York, No. 12 Civ. 1944, 2013 WL 6487384, at *9 (S.D.N.Y. Nov. 25, 2013). Accordingly, even though the First Department held that the admittance of the evidence violated state law, there is no clearly established Supreme Court precedent requiring such a finding under federal law.

    B.  Interested Witness Charge

        1.  Exhaustion

The State argues (albeit somewhat in passing) that petitioner has failed to fully exhaust his claim regarding the trial court's interested witness charge.  (Resp't Mem. 44.)  Despite this, the Court finds that the interested witness charge was

sufficiently preserved such that it must be considered in connection with petitioner's habeas petition.  As petitioner argues (and the State does not refute), the trial court was made well aware of petitioner's objections to the interested witness charge – at the charging conference (which was off the record), on the record, and then again after the charge was given.  (Reply 16-17.)

       2.  <u>Merits</u>

Petitioner argues that his "constitutional right to the presumption of innocence was compromised by the trial court's jury charge" because it "improperly conveyed to the jury that petitioner's testimony was less credible and indicated that this testimony should be judged by a different standard than the one applied to any other testimony in the trial."  (Pet. 8.)  As explained above, the trial court charged the jury as follows:

> Another factor you may consider in accessing [sic] the credibility of a witness, is whether a witness is an interested witness or a disinterested witness.  The witness is an interested witness, when, by reason of relationship, friendship, antagonism, or prejudice, in favor of or against one party or the other, the witness's testimony is, in your judgment, likely to be biased toward the side the witness favors.  The defendant, who took the stand and testified in his own behalf, is an interested witness.  It is for you to decide whether any of the other witnesses in this case should be considered interested.  Now, there is no presumption that an interested witness lies or that a disinterested witness tells the truth.  It is for you to decide to what extent, if any, a witness's interest in the outcome of this case affected his or her credibility.

(Tr. 1315-16.)[15]  According to petitioner, the trial court's interested witness charge and the "balancing language" that followed – namely, that in addition to defendant, the jurors could find any of the other witnesses interested as well – "was akin to telling the jury that, 'The defendant's testimony shouldn't be believed, you can decide if anyone else shouldn't be believed.'"  (Reply 15.)

The interested witness charge did not so infect the trial that petitioner's due process rights were violated; thus, habeas relief is unavailable on this basis.  Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004).

Petitioner argues that the Second Circuit has expressly rejected interested witness charges.  See United States v. Gaines, 457 F.3d 238 (2d Cir. 2006); United States v. Brutus, 505 F.3d 80 (2d Cir. 2007).  While petitioner puts forth a cogent and well-researched argument in this regard, his claim is nonetheless unavailing.  First, Gaines and Brutus concern federal, rather than state, prosecutions.  Second, Gaines implicitly recognizes a lack of a clearly established Supreme Court precedent, which is of course required to grant a § 2254 habeas petition.  See Williams v. Taylor, 529 U.S. 362, 381-82 (2000).  In Gaines, the Second Circuit acknowledged:

> At the outset, two propositions are clear.  First, a testifying defendant in a criminal trial has a personal interest in its outcome that is as deep as it is obvious.  Second, by testifying, the defendant places his credibility

---

[15] New York's pattern jury charge defines an interested witness as one who "by reason of relationship, friendship, antagonism or prejudice in favor of or against or party or the other, his testimony in your judgment is in fact biased, or likely biased, toward the side or party he favors." (Resp't Mem. 43 n.24.)

> directly at issue, and his interest in the outcome may
> properly be considered by the jury in determining how
> much, if any, of his testimony to believe.  Beyond those
> indisputable propositions lies more than a century of
> litigation over what a trial judge may properly say to a
> jury about a testifying defendant's credibility.

Gaines, 457 F.3d at 244.  The Court explained that while Supreme Court precedent

has long recognized that a defendant has an interest in the outcome of a trial that is

"greater than any other witness" and thus such fact may "be suggested by the court

to the jury," see Reagan v. United States, 157 U.S. 301, 305 (1895), the Supreme

Court has also imposed limits on how a defendant's interest in the outcome of a trial

may be explained to a jury.  See id. at 311; Hicks v. United States, 150 U.S. 442,

451-52 (1893).  The Supreme Court has stated:  "To implement the presumption [of

innocence], courts must be alert to factors that may undermine the fairness of the

fact-finding process.  In the administration of criminal justice, courts must carefully

guard against dilution of the principle that guilt is to be established . . . beyond a

reasonable doubt."  Estelle v. Williams, 425 U.S. 501, 503 (1976); see Gaines, 457

F.3d at 245.  As the Second Circuit implicitly acknowledges no clearer – let alone

well-established – Supreme Court precedent on the point exists.

Third, the instruction at issue in this case does not suffer from the same type

of infirmity as those at issue in Gaines and then Brutus.  In Gaines, the trial court

instructed:  "Obviously, the defendant has a deep personal interest in the result of

this prosecution.  This interest creates a motive for false testimony and, therefore,

the defendant's testimony should be scrutinized and weighted with care."  457 F.3d

at 242.  In Brutus, the trial court instructed that:

> [A] defendant who does testify on her own behalf obviously
> had a deep personal interest in the outcome of her
> prosecution.  It's fair to say that the interest which a
> defendant has in the outcome of the case is an interest which
> is possessed by no other witness.  And such an interest
> creates a motive to testify falsely.

505 F.3d at 85, 87.  In both cases, the trial court suggested that the defendant's

interest created a motive to give false testimony.

Here, the trial judge suggested petitioner was an interested witness, but

made no intimation about a motive to give false testimony.  The court also noted

that a witness's interest was only one factor to consider in determining credibility,

reiterating that it was "for you to decide to what extent, if any, a witness's interest

in the outcome of this case has affected his or her credibility."  (Tr. 1316.)  The

court's instruction did not violate either state law or clearly established Supreme

Court precedent.  Compare Blake v. Kirkpatrick, No. 08 Civ. 9288, 2009 WL

536508, at *3 (S.D.N.Y. Mar. 4, 2009) (Lynch, D.J.) (citations omitted) (explaining

that an interested witness instruction may "call[] attention to a defendant's interest

in the outcome of a trial as a factor bearing on credibility . . . so long as the

instruction does not imply that the defendant has been untruthful in his

testimony") with Hicks v. United States, 150 U.S. 442, 451 (1893) (reversing the

lower court and setting aside the verdict where the trial court instructed the jury

that the defendant's interest might cause him "to make statements to influence a

jury in passing upon our case that would not be governed by the truth" and that the

defendant "might be led away").  Thus, the court's charge was not so infirm that it

justifies a grant of habeas relief in this case.

C. <u>Right to Counsel</u>

    1. <u>Exhaustion</u>

Petitioner does not challenge that petitioner exhausted his right to counsel claim.  Thus, the Court proceeds directly to the merits of petitioner's claims.

    2. <u>Merits</u>

Petitioner argues that he "was denied his constitutional right to counsel" during the April 29-30, 2004 police interview and that as such, the statements solicited and the evidence obtained during that interview – namely, the pawn tickets and subsequently, Willis's ring – should have been suppressed at trial.  (<u>See</u> Pet. 9.)

The right to counsel before an arrest derives not from the Sixth Amendment right to counsel, but from the Fifth Amendment right against self-incrimination. <u>See</u> <u>Alexander v. State of Conn.</u>, 917 F.2d 747, 751 (2d Cir. 1990); <u>see also</u> <u>Weaver v. Brenner</u>, 40 F.3d 527, 534 (2d Cir. 1994).  If an individual's Fifth Amendment right to counsel is violated, the State may not introduce evidence obtained as a product of that violation – this principle is known as the "fruit of the poisonous true doctrine." <u>United States v. Ghailani</u>, 743 F. Supp. 2d 242, 250 (S.D.N.Y. 2010); <u>see also</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963).

During his April 29, 2004 police interview, petitioner mentioned the words "lawyer" and "attorney" on two occasions now relevant to petitioner's motion for habeas corpus.[16]  First, the trial court found as a matter of fact that when

---

[16] Hall testified that petitioner may have "made some mention [ ] about a lawyer" another time.  (Resp't Mem., Ex. C at 5.)  However, Hall could not recall any details about such occurrence.  (<u>Id.</u>)

Detectives Clifford and Calderon initially asked petitioner about his interactions and relationship with Willis, petitioner said, "Maybe I should consult with an attorney because you guys are trying to box me in here." (Id., Ex. C. at 7.) Detective Clifford "immediately reassured [petitioner] that he was not trying to box him into anything. He explained that in building a time line, a requirement of any homicide investigation, he had to speak to everyone who knew Willis and had spoken to him that day." (Id., Ex. C. at 8.) Petitioner appeared to Clifford to understand and continued to answer Clifford's questions. (See id.)

Second, after petitioner had been read his Miranda rights[17] and after petitioner provided a written statement of his version of events that indicated he had been in the deceased's apartment that morning but knew nothing about the

---

Additionally, petitioner made certain statements to the assistant district attorney at the start of a videotaped interview on the morning of April 30, 2004 suggesting that he had previously requested an attorney a number of times – these statements are a non-issue at this point because they were not introduced at trial. See, e.g., United States v. Brown, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009.)

[17] The trial court explained the sequence of events as follows:

> Clifford then asked Wilson to go over things once more with him, so that he could write down what he had to say. Before doing that, however, Clifford asked Wilson whether he would have "any problem" with his reading his rights to him. Wilson asked whether he was under arrest. Clifford responded: "If you were under arrest, I wouldn't ask you if I could read you your rights. I would just read them to you." Wilson laughed, and told him: "Go ahead, read me my rights. I know those rights better than you do." Wilson bragged, too, that he had learned about the grand jury system in the law library while in prison. Clifford in fact correctly advised Wilson of the Miranda rights, using a police department form to do so. As Clifford read each right, he asked whether Wilson understood. Each time, Wilson responded with the word "yes." Clifford recorded on the form each response as Wilson made it. Wilson then signed the form, telling Clifford that he was willing to speak with him. The time noted on the form was 6:20 p.m., less than one hour after the men began speaking, and just under two hours after Wilson's arrival at the station house.

(Resp't Mem., Ex. C. at 8-9.)

murder, and after Clifford asked petitioner whether he was holding back any information and petitioner answered in the negative, Clifford got up and went to petitioner's side of the desk to sit beside him.  (See id., Ex. C. at 10-11.)  Clifford, for the first time, asked petitioner about what appeared to be bloodstains on his shirt: "James, what are you going to do when it comes back that those stains on your clothing are blood, and that they're [the deceased's] blood?"  (Id., Ex. C at 11.)  Wilson smiled, winked, and said, "That's when I'll get a lawyer."  (Id., Ex. C at 11-13.)[18]  After that point, petitioner neither requested to consult with a lawyer nor asked to leave.

The Fifth Amendment ensures that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation."  Miranda v. Arizona, 384 U.S. 436, 471 (1966).  However, Miranda only applies to "custodial interrogations."  Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009).  "Whether an individual is "in custody" . . . is determined by ascertaining whether that individual is 'subjected to restraints comparable to those associated with a formal arrest.'"  Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 411 (1984)).  "Two discrete inquiries are essential to the determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or

---

[18] There was a discrepancy in the transcript on this point, but the trial court found as a matter of fact that Clifford testified both on direct and cross-examination that petitioner said:  "That's when I'll get a lawyer."  (Resp't Mem., Ex. C at 11-13.)

she was not at liberty to terminate the interrogation and leave." <u>Yarborough v.
Alvaraso</u>, 541 U.S. 652, 663 (2004).

Determining whether an individual invoked his right to counsel is "an
objective inquiry." <u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994).  "[I]f a
suspect makes a reference to an attorney that is ambiguous or equivocal in that a
reasonable officer in light of the circumstances would have understood only that the
suspect <u>might</u> be invoking the right to counsel, our precedents do not require the
cessation of questioning." <u>Id.</u> at 459.  That is, an individual must "clearly assert[]"
an invocation of his right to counsel.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981).

In this case, the circumstances surrounding petitioner's April 2004 interview
indicate petitioner was not subjected to custodial interrogation.  Petitioner arrived
at the scene of the crime and spoke to police officers on his own volition, agreed to
go to the precinct voluntarily, was interviewed in an office (not a prison cell or
interrogation room), and was told he was not under arrest.  Petitioner was not
handcuffed or frisked.  Petitioner was read his <u>Miranda</u> rights only after Detective
Clifford solicited his permission to do so.  The detectives ordered dinner for
petitioner and stopped their interview for about 20 minutes to allow him to eat.
The interview was not recorded.  Petitioner did not ask to leave the interview and
was never told that such a request would be denied.  Under such circumstances, no
reasonable person in petitioner's shoes would have felt he was not at liberty to leave
the interview.  <u>See</u> <u>United States v. Badmus</u>, 325 F.3d 133, 138-39 (2d Cir. 2003);
<u>Campaneria v. Reid</u>, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989).

Even were petitioner to have been subjected to custodial interrogation, he did not "clearly assert" his right to counsel.  See Edwards, 451 U.S. at 485.  Petitioner claims he first invoked his right to counsel when he said, "Maybe I should consult with an attorney because you guys are trying to box me in here."  The use of the word "maybe," in conjunction with the fact that petitioner continued to cooperate without speaking to an attorney, evinces only a possible assertion of the right to counsel – not a clear one.  See United States v. Scarpa, 897 F.2d 63, 67-68 (2d Cir. 1990) (finding statement that defendant "was going to get a lawyer" did not clearly invoke right to counsel); United States v. Walters, 963 F. Supp. 2d 138, 154-55 (E.D.N.Y. 2013) (finding statement that defendant wanted to speak with two individuals whom defendant did not identify as lawyers did not clearly invoke right to counsel); Pierre v. Artus, No. 05 Civ. 7706, 2006 WL 3960358, at *9 (S.D.N.Y. Dec. 13, 2006) (finding statement that defendant "wanted to wait until he could speak to a judge" did not clearly invoke right to counsel).

Later, in response to Detective Clifford asking "what are you going to do when it comes back that those stains on your clothing are . . . [Willis's] blood," he said, "That's when I'll get a lawyer."  (S.Tr. 143-44, 186.)  In context, this statement cannot reasonably be understood as a clear assertion of the right to counsel. Rather, petitioner was referring to a hypothetical future when he may consult a lawyer – support for the proposition that petitioner might eventually invoke his right to counsel, but that he did not actually do so.

Because petitioner has failed to prove that he clearly asserted his right to counsel during a custodial interrogation, he has no viable Fifth Amendment claim.

Similarly, petitioner's allegation that the evidence police recovered as a result of petitioner's statements – namely, the pawn tickets and the deceased's ring – should be precluded as the fruit of an unconstitutional interrogation is unavailing.

The fruit of the poisonous tree doctrine requires as a threshold matter that the tree be poisonous – i.e., that evidence be obtained illegally or unconstitutionally. Because petitioner's Fifth Amendment right to counsel was not violated during the April 2004 interview, the "fruit" of that interview similarly does not violate petitioner's constitutional rights.

Moreover, in United States v. Patane, the Supreme Court determined that the Fifth Amendment's Self-Incrimination Clause "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." 542 U.S. 630, 637 (2004). There is no indication in the record that petitioner's statements were in any way involuntary. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) (in the context of the 14th Amendment Due Process Clause, holding "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). Because petitioner's statements were voluntary, suppression of the physical evidence would have been unwarranted even if petitioner's Fifth Amendment rights had been violated.

D.  Speedy Trial Right

    1.  Exhaustion

The State argues that petitioner failed to fairly present his speedy trial argument to the New York Court of Appeals.  Petitioner argues that he did, in fact, sufficiently present the issue because his "leave application expressly sought review 'for the reasons discussed in the briefs filed in the Appellate Division,'" which purportedly addressed the issue in constitutional terms.  (Reply 24.)  Petitioner argues that this is sufficient for the claim to be deemed exhausted.  (Id.)  For purposes of this habeas petition, the Court accepts petitioner's argument and proceeds to consider the merits of petitioner's claim.

    2.  Merits

Petitioner argues that he was denied his Sixth Amendment right to a speedy trial because he "was arrested and charged on April 30, 2004," but "trial commenced on or about December 3, 2008."  (Pet. 11.)  According to petitioner, "the [four-and-a-half] year delay occurred through no fault of petitioner."  (Id.)

The Sixth Amendment, made applicable to the states through the 14th Amendment, provides:  "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ."  U.S. Const. amend. VI; see also Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  The Supreme Court has noted, however, that "the right to speedy trial is a more vague concept than other procedural rights" and that it is impossible to "definitely say how long is too long" between an initial arrest and trial.  Barker v. Wingo, 407 U.S. 514, 521 (1972); see also United States v.

36

<u>Ghailani</u>, 733 F.3d 29, 42 (2d Cir. 2013).  In order to make such a determination, courts perform a balancing test and consider the following four factors:  "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly."  <u>Barker</u>, 407 U.S. at 530; <u>see also</u> <u>Ghailiani</u>, 733 F.3d at 42-43.

Courts treat the first factor as a threshold issue:  "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  <u>Barker</u>, 407 U.S. at 530; <u>see also</u> <u>Doggett v. United States</u>, 505 U.S. 647, 652 (1992) ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time.").  The extent to which a delay is prejudicial is inversely correlated with the seriousness of the crime.  <u>Barker</u>, 407 U.S. at 530-31 ("To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").  If a court finds that the delay was presumptively prejudicial, it engages in the rest of the balancing inquiry.  <u>See</u> <u>id.</u> at 530 (explaining that "[t]he length of the delay is to some extent a triggering mechanism").

In considering the second factor, reason for the delay, "different weights should be assigned to different reasons."  <u>Id.</u> at 531.  "A deliberate attempt to delay the trial in order to hamper the defendant should be weighted heavily against the government."  <u>Id.</u>  "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the

ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Id. "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." Id.

For the third factor, courts accord "strong evidentiary weight" to the length of time a defendant waits to assert his speedy trial right; to wit, the longer a defendant waits to assert his right, the less likely his constitutional rights were violated. Id. at 531-32.

Finally, in considering the fourth factor, courts must determine the extent to which the delay prejudiced the interests that the speedy trial right acts: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. at 532.

These four factors "are related [] and must be considered together with such other circumstances as may be relevant." Id. at 533.

Here, the four-and-a-half-year delay between arrest and trial is presumptively prejudicial. The State argues that, given the seriousness of the crime with which petitioner was charged, the delay between petitioner's arrest and trial falls "within the acceptable range." (Resp't Mem. 50.) But, even a murder charge cannot so completely excuse a four-and-a-half-year delay that the Court need not consider the remainder of the balancing test. See Barker, 407 U.S. at 521, 533 (finding five year delay in a murder case "extraordinary"); see also Doggett, 505

U.S. at 652 (finding that the eight-and-a-half year delay between petitioner's indictment and arrest "clearly suffices to trigger the speedy trial enquiry"). Thus, the Court proceeds to consider the remaining factors.

The remaining factors set forth in Barker reveal there was no violation of petitioner's Sixth Amendment right in this case.

With respect to the reason for the delay, the State blames "the technical limitations of the Medical Examiner's Office" for the 20 month delay between arrest and indictment.[19] (Resp't Mem. 50.) To wit, the DNA testing performed on petitioner's sweatshirt, which eventually revealed the blood on that sweatshirt was Wills's, "took considerable time." (Id.) The remainder of the delay between indictment and trial (roughly two-and-a-half years) is attributable to petitioner's extensive motion practice and repeated arrests – hardly factors within the State's control. Thus, even accepting that the second Barker factor works in petitioner's favor with respect to the first 20 months, the cause of the remaining delay does not.

The third Barker factor weighs in favor of petitioner's claim. Petitioner made two speedy trial act motions, the first rather quickly and the second, more than two years later. That is sufficient.

---

[19] Petitioner rejects this argument, contending: "To begin, the 'need' for DNA testing was hardly a need. Petitioner had admitted, in his second statement, that the blood on his clothing was the victim's. Respondent was free to present this statement to the [g]rand [j]ury." (Reply 26.) Moreover, according to petitioner, the technical limitations argument is without merit because "this same medical examiner's office had previously conducted the far more complex testing required to identify the victims of the World Trade Center attacks." (Id.) Petitioner also rejects the argument because "the People had the DNA results on September 6, 2005, yet the case was not presented to a grand jury until January 20, 2006. The clear implication is that 'waiting for DNA results' is a mere pretext." (Id. 27.)

With respect to the fourth interest articulated by the Supreme Court, petitioner argues three specific instances of harm:  (1) Detective Hall was unable to remember clearly during the suppression hearing that petitioner mentioned the word lawyer on April 29, 2004; (2) "Officer Nguyen could not [remember] the precise words petitioner used when he allegedly admitted to killing someone"; and (3) "Drake could not remember the identity of [a] person staying in the victim's apartment on the night before the murder." (Reply 28-29.)  In terms of Detective Hall's memory, in ruling against the petitioner's motion to suppress, the court provided various alternative bases and relied on numerous detectives who testified to the contents of petitioner's statements on April 29, 2004.  (Resp't Mem., Ex. C.)  Moreover, even if Detective Hall's memory might have damaged petitioner's motion to suppress, the significant delay between the April 2004 interview and the lapse in Detective Hall's memory was largely due to delay caused by petitioner's unrelated arrests and motion practice; thus, that damage can hardly be considered unfairly prejudicial.  As for petitioner's second and third alleged harms, they are not harms at all and work in favor of petitioner, not against him.  See Barker, 407 U.S. at 521.  As a result, there was no appreciable unjustified prejudice to petitioner's liberty interests and the fourth Barker factor weighs in favor of the respondent.

Although four-and-a-half years is a long time to wait between arrest and trial, there were a number of reasons for the delay that were beyond the state's control (and many within the petitioner's control) and there was no appreciable

prejudice to petitioner as a result of the delay.  Thus, petitioner's constitutional right to a speedy trial was not violated.

### E. Fair and Impartial Jury

#### 1. Exhaustion

The State argues that petitioner's claim is barred by procedural default because he did not fairly present his constitutional claim regarding juror bias to the First Department – he "relied almost exclusively on two state-court precedents interpreting two state statutes" and "never cited to the federal standard governing claims of juror bias." (Resp't Mem. 58.)  In denying petitioner's claim, the First Department relied solely on state law.  (Id.)

The Court agrees that petitioner's treatment of his impartial jury claim was insufficient to have adequately raised the constitutional issues in play.  Even were that not the case, however, the claim fails on the merits for the reasons described below.

##### a. Merits

Petitioner argues that he "was denied the right to a fair trial by a jury free of bias and[] external influence" as a result of Filz's Facebook posts.  (See Pet. 12.)

The Sixth Amendment, made applicable to the states by the 14th Amendment, provides:  "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ."  U.S. Const. amend. VI; see also Parker v. Phillips, 717 F. Supp. 2d 310, 325 (S.D.N.Y. 2010) (citing Duncan v. Louisiana, 391 U.S. 145, 159 (1968)).  "[T]he right to jury trial guarantees to the

criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v.</u>
<u>Dowd</u>, 366 U.S. 717, 722 (1961). "It is not required, however, that the jurors be
totally ignorant of the facts and issues involved." <u>Id.</u> "To hold that the mere
existence of any preconceived notion as to the guilt or innocence of an accused,
without more, is sufficient to rebut the presumption of a prospective juror's
impartiality would be to establish an impossible standard." <u>Id.</u> at 722-23. Instead,
"if the juror can lay aside his impression or opinion and render a verdict based on
the evidence presented in court," that is sufficient. <u>Id.</u>

Whether a particular juror is impartial is a question of fact, subject on a
habeas petition to a presumption of correctness. <u>See</u> 28 U.S.C. 2254(e)(1) ("[A]
determination of a factual issue made by a State court shall be presumed to be
correct. The applicant shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence."); <u>Rushen v. Spain</u>, 464 U.S. 114, 120
(1983). A trial court's determination may only be overturned on habeas review
upon a showing of manifest error. <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 428 (1991).

While it would have been prudent to instruct the jurors against posting on
social media at the outset of the trial,[20] the trial court's decision not to set aside the
verdict due to Filz's posts does not amount to a manifest error. The trial court held
a post-verdict hearing to address the Facebook posting issue. (<u>See</u> 12/2 Tr.[21]) Filz

---

[20] <u>See</u> <u>United States v. Ganias</u>, No. 12-240-cr, 2014 WL 2722618, at *5-6 (2d Cir. June 17, 2014).
After this incident, Judge Zweibel acknowledged the wisdom of preliminary instruction warning
jurors against using social media. (<u>See</u> Resp't Mem., Ex. L at 22 ("In the future my instructions are
going to be they are not to go on Face Book [sic] or the Internet.").)
[21] Citations to "12/2 Tr." refer to the transcript of Dec. 2, 2008.

stated unequivocally under oath that she has no "preexisting bias against criminal defendants," that she "decided this case with the other jurors based solely upon the evidence presented in [the] courtroom," that she "afforded the defendant the presumption of innocence," that she "did not discuss, did not deliberate in the case before the judge told [her] it was okay to" do so, that she did not "talk about the substance of the case with anyone," and that she was not "in anyway influenced by anything that anyone [sic] said [on Facebook]." (12/2 Tr. 16-17.) Judge Zweibel determine Filz's testimony to be credible. (12/2 Tr. 22.) He held: "I find that based upon her testimony she wasn't influenced by any of the remarks by people who wrote back to her in response to her in response to her stating she is serving on a murder trial. . . .  Anything that was discussed on [Facebook] or rather the comments that were made to her were not discussed among the other jurors." (Id.) On a habeas motion, the Court defers to the trial court's findings of fact. See Wainwright v. Witt, 469 U.S. 412, 428 (1985) (explaining that the question of whether a juror is biased turns on "determinations of demeanor and credibility that are peculiarly within a trial judge's province"); Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir. 1995) ("Under § 2254(d), the state court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial").

Accordingly, petitioner's claim that his Sixth Amendment right to an impartial jury was violated does not justify granting habeas relief in this case.

VI.    CONCLUSION

For the reasons set forth above, the Court DENIES petitioner's request for habeas relief.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253(c).  Pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal.  Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is hereby directed to dismiss the pending petition and terminate this action.


SO ORDERED.

Dated:        New York, New York
              August 20, 2014

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge


CC:
James Wilson
09-A-3064
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011-0149
PRO SE